Filed 11/4/14  P. v. Orrison CA4/3

# NOT TO BE PUBLISHED IN OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FOURTH APPELLATE DISTRICT

## DIVISION THREE

| | |
|---|---|
| THE PEOPLE, | |
| Plaintiff and Respondent, | G049042 |
| v. | (Super. Ct. No. P00075) |
| WILEY JOSEPH ORRISON, | O P I N I O N |
| Defendant and Appellant. | |

Appeal from an order of the Superior Court of Orange County, Gregg L. Prickett, Judge.  Affirmed.

Marianne Harguindeguy, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Dane R. Gillette, Chief Assistant Attorney General, Julie L. Garland, Assistant Attorney General, A. Natasha Cortina, Kristen Kinnaird Chenelia and Christopher Beesley, Deputy Attorneys General, for Plaintiff and Respondent.

\*        \*        \*

Defendant Wiley Joseph Orrison appeals from the trial court's order finding Orrison violated the terms of his parole, reinstating his parole, and committing him to Orange County jail for 120 days. He contends the court violated his constitutional rights to due process and to the effective assistance of counsel by requiring Orrison to remain in what his attorney called the "cage" inside the courtroom instead of being seated at his counsel's table during the parole revocation hearing. Orrison also contends the court violated his constitutional right to confrontation by admitting evidence of the results of field testing of substances found during a search of his residence.

We affirm. Our review of the record shows Orrison was represented by counsel at the parole revocation hearing and the trial court ensured Orrison's access to his counsel and ability to speak with his counsel throughout the hearing. That Orrison was seated inside the cage during the hearing did not, in and of itself, constitute a violation of his constitutional rights. Even if the trial court erred by denying counsel's request that Orrison be seated with his counsel, Orrison has not shown how he was prejudiced. Were we to assume the court erred by admitting evidence that field testing of the brown liquid in the syringe and the white crystalline substance in the baggies showed the presence of heroin and methamphetamine, respectively, any such error was harmless beyond a reasonable doubt.

FACTS

On July 8, 2013, Garden Grove Police Officer Paul Tessier went to Orrison's residence in Garden Grove, where he spoke with Orrison and two other residents. Orrison appeared very agitated and nervous; he was sweating. Orrison told Tessier that he was on parole. Tessier searched the residence. Near the bed in Orrison's bedroom, Tessier found a hypodermic syringe that contained a brown liquid. Tessier conducted a field test on the brown substance by using a "NIK" test. The test caused the

2

substance to change to a color which the test's packaging stated reflects the presence of heroin (Tessier could not recall what color the substance changed to when tested, but he recalled that the color change matched the "heroin" color stated on the test's packaging).

In a bathroom of Orrison's residence, Tessier found a black Nintendo DS zippered pouch that contained a glass smoking pipe of the type used for smoking methamphetamine and two clear plastic baggies containing a white crystalline substance. He used the NIK test to identify the white crystalline substance. The color of the white crystalline substance changed to match the color on the test's packaging, which identified the presence of methamphetamine. Tessier weighed the two baggies; one weighed 12.5 grams and the other weighed 9.1 grams. The black zippered pouch also contained a digital scale, two baggies containing miscellaneous pills, and two smaller baggies, each of which contained a brown tar-like substance.

PROCEDURAL HISTORY

On July 22, 2013, the California Department of Corrections and Rehabilitation filed a petition for the revocation of Orrison's parole under Penal Code section 3000.08. The petition stated that Orrison had been sentenced to state prison for violating Vehicle Code section 2800.2 (disregard for safety), and, while in prison, he was convicted of conspiracy to introduce a controlled substance into prison and assault with a deadly weapon, for which he was sentenced to a five-year prison term and a two-year prison term, respectively. The petition also stated he was paroled on May 11, 2013, on terms and conditions including that he "[v]iolate [n]o [l]aw." The petition alleged that on July 8, 2013, however, police officers contacted Orrison in "the company of other known parolees and/or probationers" at a residence where the officers found drugs and drug paraphernalia. Orrison was arrested and charged with possession for sale of heroin, morphine, and methamphetamine "with two strike allegations."

3

At the arraignment on the petition for the revocation of parole, the trial court found probable cause for issuance of the petition and scheduled a hearing. At the hearing, which took place in a "makeshift courtroom at the jail," Orrison's counsel requested that Orrison be permitted to sit at his counsel's table instead of remaining in the cage inside the courtroom. The trial court denied the request.

Tessier was the only witness to testify at the hearing. The court found Orrison in violation of his parole. The court ordered Orrison's parole reinstated, with "[a]ll terms and conditions of parole to remain the same," and further ordered that Orrison serve 120 days in Orange County jail, for which he received actual and conduct credits totaling 77 days. Orrison appealed.

DISCUSSION

I.

*The Trial Court Did Not Err by Denying Orrison's Counsel's Request That Orrison Sit at His Counsel's Table During the Parole Revocation Hearing.*

Orrison contends his confinement in a cage inside the courtroom during his parole revocation hearing deprived him of his constitutional rights to due process and the effective assistance of counsel. For the reasons we will explain, Orrison's argument is without merit.

In *People v. Arreola* (1994) 7 Cal.4th 1144, 1152-1153, the California Supreme Court summarized the procedural safeguards required by the federal Constitution for parole and probation revocation proceedings, stating in part: "In 1972, in *Morrissey* [*v. Brewer* (1972) 408 U.S. 471], the [United States Supreme C]ourt defined the minimal due process requirements for parole revocation, recognizing that parolees enjoy a 'conditional liberty' requiring constitutional protection [citation], and that both the parolee and society have a stake 'in not having parole revoked because of erroneous information or because of an erroneous evaluation of the need to revoke parole . . . .'

4

[Citation.] *Morrissey* set forth a two-step procedure required in order to afford parolees due process of law: an initial preliminary hearing to determine whether probable cause exists to believe that a parole violation has occurred, and thus to justify temporary detention, and a more formal, final revocation hearing requiring factual determinations and a disposition based upon those determinations. [Citation.] [¶] In discussing the minimum constitutional requirements applicable to the final revocation proceeding, *Morrissey* held that due process requires '(a) written notice of the claimed violations of parole; (b) disclosure to the parolee of evidence against him; (c) opportunity to be heard in person and to present witnesses and documentary evidence; (d) the right *to confront and cross-examine adverse witnesses* (*unless the hearing officer specifically finds good cause for not allowing confrontation*); (e) a "neutral and detached" hearing body such as a traditional parole board, members of which need not be judicial officers or lawyers; and (f) a written statement by the factfinders as to the evidence relied on and reasons for revoking parole.' [Citation.] At the same time, *Morrissey* emphasized that 'the process should be flexible enough to consider evidence including letters, affidavits, and other material that would not be admissible in an adversary criminal trial' [citation]." (Fn. omitted.)

Orrison does not contend he was deprived of any of the procedural safeguards expressly identified in *Morrissey v. Brewer*, *supra*, 408 U.S. at pages 1152-1153, at his parole revocation hearing. Although Orrison was represented by counsel at the hearing, he argues his constitutional rights to due process and to the effective assistance of counsel were violated because the trial court denied his counsel's request that Orrison sit at his counsel's table. Orrison argues that his being confined in the cage resulted in him being physically too far away from his counsel to effectively and confidentially communicate with him during the hearing. He further argues his communication difficulties were exacerbated by the noise level in the room, primarily caused by the opening of a door to a holding area of the jail facility. Orrison also argues

5

that "[c]onfining [him], who had not been found guilty of anything, during the hearing hurts the integrity of the system and [his] ability to present his case effectively."[1]

Although the trial court denied Orrison's counsel's request that Orrison be seated at his counsel's table, the court ensured Orrison's access to, and ability to effectively communicate with, counsel, and thus to defend himself, throughout the hearing by (1) permitting Orrison's counsel to move counsel's table closer to the cage and inviting Orrison's counsel to sit anywhere he wished in the courtroom, including in a chair next to the cage; (2) directing that the other prisoner seated in the cage be removed for the duration the hearing; (3) asking Orrison's counsel whether he needed time to speak with Orrison, and repeatedly permitting Orrison and counsel to converse whenever requested; (4) directing security personnel to move away from where Orrison and his counsel were conversing so that their conversations would not be overheard; (5) permitting Orrison's counsel to provide Orrison with paper and a pencil; (6) adjusting where in the courtroom Tessier sat when he testified to maximize his visibility to Orrison

---

[1] Orrison contends: "The right of a criminal defendant to sit next to defense counsel in the courtroom, and to appear there unconfined absent a finding of manifest need[,] have been long established in criminal trials." But "*Morrissey* [*v. Brewer*] did not equate parole revocation hearings with criminal prosecutions in any sense, and the court left it to the states to determine flexible procedural rules for implementing its minimal due process requirements." (*People v. Racklin* (2011) 195 Cal.App.4th 872, 879.) Generally, trial courts have been required to make a finding of the existence of a "manifest need" before restraining a criminal defendant in the context of courtroom proceedings in the jury's presence. (*People v. Duran* (1976) 16 Cal.3d 282, 290-292; see *Deck v. Missouri* (2005) 544 U.S. 622, 632; but see also *People v. Fierro* (1991) 1 Cal.4th 173, 219-220 ["the unjustified use of restraints could, in a real sense, impair the ability of the defendant to communicate effectively with counsel [citation], or influence witnesses at the preliminary hearing"].) Orrison has not cited any legal authority that requires the trial court to make a finding that a manifest need exists before restraining a criminal defendant (in the form of shackles or being seated in a cage) in the context of a parole revocation hearing. In any event, and as discussed *post*, the record does not show Orrison's ability to communicate with his counsel was materially impaired or that he otherwise suffered any prejudice as a result of the court's denial of his counsel's request Orrison be seated at his counsel's table.

and his counsel; and (7) directing the prosecutor and Tessier to enunciate so that they could be clearly heard by everyone in the courtroom.

When Orrison's counsel commented on the number of jail and other personnel in the courtroom, who he thought were in a position to possibly overhear counsel's conversations with Orrison, the trial court asked, "[h]ow is that different than in a trial where the defendant is seated next to you at a table and the prosecutor is seated right there and the bailiff is there and the court reporter is there?" The court stated: "The court does not see any difference in that situation from this situation. Obviously, the defendant is going to have to whisper just like they have to whisper in a trial court. And I'm creating a situation where the defendant can talk to his [counsel] right now and have that conversation in probably a more confidential situation than in a trial court." The court also stated for the record that Orrison was not in shackles.

Orrison's counsel complained about noise coming from the opening of a door to other holding areas in the jail. The court asked the prosecutor to reask the question he had asked Tessier before counsel's objection. The court later added that any difficulty in hearing was due to Tessier's and the prosecutor's mumbling, not to "extraneous noise"; as discussed *ante*, the court directed them to enunciate clearly. Orrison's counsel again expressed trouble hearing "because of noise that is emanating from the doors five feet to my right which lead to holding tank areas." The court asked Orrison's counsel if he wished to have any questions read back. Orrison's counsel requested a readback, and the court granted that request and directed the court reporter to do so.

Orrison's counsel informed the court he was still having trouble concentrating while sitting next to the cage and the door to the holding area because of the noise which he found "very disturbing, irritating and interrupting [his] train of thought." The court offered Orrison's counsel a break. The court also stated: "Sir, I'm not ordering that you have to sit there. I gave you that as a suggestion when your client

7

wanted to have a conversation with you. You are welcome to sit anywhere in the courtroom you want to sit. [¶] And if your client would like to speak with you, then you may step back there and speak with your client. But I'm not requiring that you sit there. You may sit anywhere you want."

Orrison's counsel asserted that on six occasions during the hearing, Orrison had attempted to communicate with him. The trial court responded by stating that counsel's statement was contrary to the court's observation. The court further stated it had observed Orrison only once attempting to communicate with his counsel, and that the court's "eyes have been mostly trained on that because you have brought that to the court's attention."

Orrison argues the trial court's failure to allow him to sit at his counsel's table instead of in the cage "hurts the integrity of the system" because Orrison had not yet been found guilty of anything. Orrison's argument is without merit because, unlike a criminal defendant standing trial for charged offenses, "a convicted felon released on parole is subject to substantial restraints on his liberty and is deemed to remain in the constructive custody of the Department of Corrections and Rehabilitation." (*People v. Nuckles* (2013) 56 Cal.4th 601, 609.)

Although the seating arrangement during the parole revocation hearing was not ideal from Orrison's counsel's perspective, any inconvenience that arose from the trial court's denial of Orrison's counsel's request Orrison be seated at his counsel's table did not amount to a deprivation of Orrison's rights to due process or the effective assistance of counsel.

Even assuming for the purposes of argument the trial court erred by denying Orrison's counsel's request, Orrison has failed to show how he was prejudiced, particularly in light of the trial court's continuing efforts to ensure Orrison's access to, and ability to communicate with, his counsel. In his appellate briefs, Orrison contends the trial court's order constituted structural error that did not require a showing of

8

prejudice. Orrison has not cited to any applicable legal authority, and we have found none, that supports his position.

II.

*Any Error in Admitting the Results of the NIK Field Tests*
*Was Harmless Beyond a Reasonable Doubt.*

Orrison argues that at the parole revocation hearing, the admission of evidence regarding the results of the NIK tests, identifying substances found in Orrison's residence, violated his constitutional right of confrontation. He argues, "while Officer Tessier conducted the final piece of the NIK chemical test, he is not the scientist responsible for the test. Officer Tessier did not know what the test consisted of, how it worked, who had assembled it, or whether it was accurate. . . . In fact, he was not even able to recall what color the test was supposed to turn in the presence of heroin or methamphetamine. . . . Therefore, cross[-]examining Officer Tessier offered little benefit to [Orrison]."

We do not need to address whether the trial court erred by admitting the evidence of the NIK test results showing the presence of heroin in the syringe and showing the presence of methamphetamine in the baggies containing a white crystalline substance because, even assuming admitting that evidence constituted error, any such error was harmless beyond a reasonable doubt.

Confrontation clause violations are subject to federal harmless error analysis under *Chapman v. California* (1967) 386 U.S. 18, 24. (*People v. Lewis* (2008) 43 Cal.4th 415, 461.) This standard provides, "an otherwise valid conviction should not be set aside if the reviewing court may confidently say, on the whole record, that the constitutional error was harmless beyond a reasonable doubt. [Citations.]" (*Delaware v. Van Arsdall* (1986) 475 U.S. 673, 681.) "Whether such an error is harmless in a particular case depends upon a host of factors, all readily accessible to reviewing courts.

9

These factors include the importance of the witness' testimony in the prosecution's case, whether the testimony was cumulative, the presence or absence of evidence corroborating or contradicting the testimony of the witness on material points, the extent of cross-examination otherwise permitted, and, of course, the overall strength of the prosecution's case. [Citations.]" (*Id.* at p 684.)

The prosecution must prove a parole violation by the preponderance of the evidence standard, as opposed to the beyond a reasonable doubt standard applicable to criminal trials. (Pen. Code, § 3044, subd. (a)(5) ["Parole revocation determinations shall be based upon a preponderance of evidence admitted at hearings including documentary evidence, direct testimony, or hearsay evidence offered by parole agents, peace officers, or a victim."].)[2]

Here, the evidence presented at the parole revocation hearing consisted of the uncontroverted testimony of Tessier. Orrison neither called witnesses in his defense nor presented any affirmative defenses. Tessier testified that on July 8, 2013, when he encountered Orrison, he observed Orrison to be nervous, agitated, and sweaty. In the course of a parole search of Orrison's residence, Tessier testified he had found a hypodermic syringe containing a brown liquid, in Orrison's bedroom, and, in the bathroom, he had found a black zippered pouch containing a glass pipe Tessier identified as the type commonly used to smoke methamphetamine, two baggies containing a white crystalline substance, two baggies containing a brown tar-like substance, two baggies containing pills, and a digital scale. These items are commonly found in the context of

---

[2] Penal Code section 3044, subdivision (a)(6) provides: "Admission of the recorded or hearsay statement of a victim or percipient witness shall not be construed to create a right to confront the witness at the hearing." (See *People v. Racklin*, *supra*, 195 Cal.App.4th at p. 879 [reiterating the United States Supreme Court's statement in *Morrissey v. Brewer*, *supra*, 408 U.S. at page 489, that the parole revocation process "'should be flexible enough to consider evidence . . . *that would not be admissible in an adversary criminal trial*'"].)

possession of illegal drugs, if not possession of illegal drugs for the purpose of sale. Even if the trial court had not admitted the NIK testing results showing the presence of heroin in the syringe and methamphetamine in the baggies, we conclude that it is beyond a reasonable doubt the trial court would have found, by a preponderance of the evidence, that Orrison was in possession of illegal drugs and drug paraphernalia in violation of his parole condition that he violate no law.

### DISPOSITION

The order is affirmed.

FYBEL, J.

WE CONCUR:

MOORE, ACTING P. J.

THOMPSON, J.

11